**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **ANGELA L. BEEBE,** ) | **CASE NO. 3:13CV2288** |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **MAGISTRATE JUDGE** |
| ) | **GEORGE J. LIMBERT** |
| ) | |
| **CAROLYN W. COLVIN[1],** ) | |
| **ACTING COMMISSIONER OF** ) | **MEMORANDUM OPINION & ORDER** |
| **SOCIAL SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |

Angela L. Beebe ("Plaintiff"), seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Court AFFIRMS the ALJ's decision and dismisses Plaintiff's case with prejudice.

**I.    PROCEDURAL AND FACTUAL HISTORY**

Plaintiff applied for SSI on February 17, 2010, alleging disability beginning March 1, 2008 due to bipolar disorder, addiction, back and neck problems, and behavioral issues. ECF Dkt.#14, Transcript of proceedings ("Tr.") at 161-166, 181. The SSA denied Plaintiff's application initially and on reconsideration. *Id.* at 73-80. Plaintiff requested an administrative hearing, and on July 17, 2012, the Administrative Law Judge ("ALJ") conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id.* at 26, 90. On August 10, 2012, the ALJ issued a Decision denying benefits. *Id.* at 11-20.

Plaintiff requested review of the Decision, and on September 12, 2013, the Appeals Council denied the request for review. Tr. at 1-7. On October 15, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On January 23, 2014, Plaintiff filed a brief on the merits. ECF Dkt. #17. On February 21, 2014, Defendant filed a brief on the merits. ECF Dkt. #18. Plaintiff filed

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

a reply brief on March 4, 2014. ECF Dkt. #19.  The parties consented to the jurisdiction of the undersigned on December 31, 2013.  ECF Dkt. #16.

## II.   MEDICAL AND TESTIMONIAL EVIDENCE

### A.   RELEVANT MEDICAL HISTORY

#### 1.   Medical History of Plaintiff's Physical Impairments

On March 23, 2010, Plaintiff presented to Dr. Trivedi for a physical examination at the request of the agency.  Tr. at 232-237. Dr. Trivedi noted that Plaintiff complained of low back and neck pain and had such complaints since 2001 when she was in a motor vehicle accident while she was eight months pregnant.  *Id.* at 232.  Plaintiff reported that she had a left collar bone fracture at the time, crushed ribs, and neck and back pain.  *Id.*  She indicated that she was hospitalized for a week and has treated with medication since then but had no physical therapy, injections or chiropractic treatment.  *Id.*  Upon examination, Dr. Trivedi found that Plaintiff had no musculoskeletal atrophy, swelling, spasm or skin color changes, negative straight leg raising bilaterally, and palpable pulses, and tenderness in the cervical and lumbar paraspinal muscles.  *Id.* at 233.  Dr. Trivedi performed manual muscle testing, which showed all normal results, with some limits on the cervical spine, dorsolumbar spine and shoulder ranges of motion with complaints of pain.  *Id.* at 233-235.  Dr. Trivedi noted that Plaintiff had a slow guarded gait on a level surface without an ambulatory aid and she was able to rise from a chair, reach overhead and walk on her heels and toes.  *Id.* at 236.  Plaintiff's sensory examination was normal and Dr. Trivedi noted that no past x-rays were available for review.  *Id.*  Dr. Trivedi diagnosed chronic neck pain, chronic low back pain and depression and she opined that Plaintiff could sit, stand and walk with frequent rest periods, and Plaintiff could speak, hear, travel, and handle objects.  *Id.* at 236-237.

On April 25, 2010, Dr. McCloud, an agency physician, reviewed Plaintiff's file and concluded that Plaintiff had no medically determinable severe physical impairments.  Tr. at 242.  He noted the normal consultative examination results and noted that Plaintiff's gait and back were examined and determined to be normal when she went to the emergency room in July of 2009 for a toothache.  *Id.*

Plaintiff treated for other ailments, including toothaches and acute bronchitis, and physical examinations showed normal cervical and upper and lower extremity ranges of motion and normal neurological examinations. Tr. at 336-340, 347-368. Treatment notes show that she complained of back pain on June 16, 2010 while at a physical assessment. *Id.* at 336-340, 347. She was diagnosed with chronic back pain secondary to a motor vehicle accident that occurred five years ago. *Id*. at 341.

Plaintiff participated in physical therapy for her cervical and back pain off and on from February 2011 through April of 2011, and again from July of 2011 through December of 2011. Tr. at 373-388. She was discharged from therapy on April 4, 2011 because she had missed two or more sessions and her change in insurance companies impacted continuation of her last group of therapy sessions. *Id*. at 388. On December 9, 2011, Plaintiff complained to the physical therapist about right shoulder pain after she fell off of a bicycle two weeks prior to the session. *Id*. at 373.

Dr. Dasani treated Plaintiff for her neck, upper back, lower back and left extremity pain beginning in December of 2010. Tr. at 407-458, 462, 517-535. He noted that Plaintiff had been in a motor vehicle accident eight years ago and never resolved her back pain and numbness in her upper back. *Id*. He noted her neck and back pain and stiffness, as well as her depression, anxiety and insomnia. *Id.* Upon physical examination, he found no joint effusion or abnormalities beyond Plaintiff's cervical and lumbar spine tenderness. *Id.* He diagnosed cervical and lumbar degenerative disc disease and he prescribed physical therapy and Vicodin. *Id.* at 460. He also made reference to checking x-rays and indicated "get copy," but no x-rays were located in the record. *Id*. at 46.

Plaintiff thereafter treated with Dr. Dasani for monthly medication management. Tr. at 407-463, 517-535. At each appointment, Dr. Dasani noted physical examination findings which showed no swelling or effusion of the lumbosacral spine, and sometimes the presence of spasms, diminished sensation and sluggish reflexes. *Id.* Dr. Dasani refilled Plaintiff's prescriptions at each visit, varying the Vicodin dosages and adding other medications at times, including Ibuprofen 400MG. *Id.*

A June 20, 2011 treatment note shows that someone had handwritten "1/6/11" on the side of the page and indicated "cerv spine - calcification of spinous process lumbar spine - lumbar spondylosis DJD L4-L5." Tr. at 446. However, Plaintiff's activities were rated as a 10/10 for

general activities, 9/10 for interactions with other people, 7/10 for ability to work, sleep and enjoyment of life. *Id.* On July 18, 2011, Plaintiff indicated that her treatment and medication had relieved her pain by 80% since her last visit and she rated her general activity level, ability to work, interactions with other people and her enjoyment of life as 5/5. *Id*. at 444.

On May 29, 2012, Plaintiff presented to Dr. Dasani for pain management and she reported that she had a 70% benefit from treatment at the last visit and she ran out of medication on May 27, 2012. Tr. at 410. Her general activities were rated 7/10, her mood and enjoyment of life were 0/10, her ability to work was 9/10 and her sleep was rated 5/10. *Id.* Her Vicodin was refilled. *Id*. at 412.

### 2. Medical History Concerning Plaintiff's Mental Impairments

On November 21, 2009, Licensed Social Worker Szegedi completed an adult diagnostic assessment of Plaintiff at Plaintiff's request as Plaintiff wanted to get back on psychotropic medications. Tr. at 243. She indicated that she had been on and off her medications for several years and had been off for one entire month and she could tell the difference. *Id*. at 248. Plaintiff reported that she had not worked in over a year and she had a long history of alcohol problems and had lost custody of all of her children due to alcohol use in the past. *Id.* Plaintiff indicated that she was sad because her son was in the military and her husband was recently sent to prison for ten years. *Id*. Plaintiff noted that she had no friends, she had started going back to church, and she used to go to AA. *Id*. She reported having 3 jobs in the last 5 years and lost a job because she could not work double shifts as requested. *Id*. at 246. She indicated that she felt that she was not stable enough to work because she had mental health issues and she was in her own world. *Id.* She stated that she wanted to work, but she felt like she could not focus, she was irritable, restless, could not sleep, she paced, and she could not handle being around a lot of people. *Id.*

Plaintiff reported being depressed on most days and crying and being nervous. Tr. at 250. She had low energy and found it difficult to even shower, comb her hair or make appointments. *Id.* She stated that she felt isolated from others and all alone and did not know why she felt that way. *Id.* Plaintiff was assessed with bipolar disorder, type II, depressive type, cocaine dependence in full sustained remission since 2001 and alcohol dependence in full sustained remission since 2002. *Id.* at 254. Ms. Szegedi rated Plaintiff's global assessment of functioning ("GAF") at 50, which

indicated serious symptoms.  *Id.*  She recommended medication management for Plaintiff, as well as outpatient mental health services, community referrals and crisis management as needed.  *Id.*

On January 27, 2010, Plaintiff presented to Dr. Hong, a psychiatrist at Zepf Community Mental Health Center, for psychiatric follow up.  Tr. at 257.  Plaintiff related that she had not been taking any medications for her mental health conditions for a couple of years since when she living in Mississippi with her husband and they moved to Toledo and she had yet to get linked with a treatment center.  *Id.*  She indicated that her husband was sent to prison in Mississippi a year ago and she was feeling irritable, anxious and depressed.  *Id.*  She reported that she was paranoid, became angry easily, she did not want to be around people, and she had difficulty sleeping.  *Id.*  She requested to be put back on medications.  *Id.*

Dr. Hong noted that Plaintiff had no history of psychiatric hospitalizations and she was treated by her family doctor in Mississippi for depression and anxiety.  Tr. at 257.  Upon examination, Dr. Hong found that Plaintiff had an appropriate affect and eye contact, relevant speech, average intellectual functioning, poor concentration and attention levels, intact memory, some insight into her problems, and fair judgment.  *Id.* at 258.  Dr. Hong diagnosed Plaintiff with major recurrent severe depressive disorder without psychotic features, rule out bipolar disorder not otherwise specified, history of cocaine dependence and alcohol dependence in full sustained remission, and her GAF rating was 50.  *Id.*  Dr. Hong recommended psychiatric follow up and medication management and she prescribed Seroquel.  *Id.* at 259.

On March 10, 2010, Dr. Hong completed a mental residual functional capacity ("MRFC") assessment for the Ohio Job and Family Services agency.  Tr. at 239. She opined that Plaintiff was not significantly limited in her abilities to:  remember locations and work-like procedures; understand, remember, and execute very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and in being aware of normal hazards and taking appropriate precautions.  *Id.*  She opined that Plaintiff was moderately limited in her abilities to: understand, remember, and execute detailed instructions; maintain attention and concentration

for extended periods; work with or near others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the workplace; travel in unfamiliar places or use public transportation; and in setting realistic goals or making plans independently of others.  *Id*.  Dr. Hong further opined that Plaintiff was markedly limited in her abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and in completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  *Id*.  Dr. Hong concluded that Plaintiff was unemployable and her conditions and limitations would last twelve months or more.  *Id*.  In completing the Ohio Job and Family Services Physician Certification of Medication Dependency form, Dr. Hong indicated Plaintiff's diagnoses as major recurrent depression without psychotic features since 2007 and a rule out diagnosis of bipolar disorder.  *Id*. at 240.  Dr. Hong noted Plaintiff's medications as Seroquel and Buspar.  *Id*.

Plaintiff followed up with a nurse at Zepf with regard to her medications.  Tr. at 263-275. On February 24, 2010, Plaintiff reported that she never started the Buspar because she could not afford the co-payment.  *Id*. at 269.   Plaintiff stated on subsequent appointments that she was compliant with her medications but she had run out of Buspar on April 10, 2010.  *Id*. at 263.  She complained of back pain at each appointment and reported that she was still experiencing a lot of stress because her son was headed to Iraq and her husband was in prison.  *Id*.  Her eye contact was good, her mood was depressed, and she had full affect, clear speech, goal-directed thought, but she reported poor sleep and fair appetite.  *Id*.  Her medications were continued and her Seroquel was increased.  *Id*.  She reported no side effects from the medications.  *Id*.

On April 28, 2010, Dr. Hong's treatment notes show that she met with Plaintiff for medication management and Plaintiff was stressed because her son left for Iraq and she was frustrated because of her back and shoulder pain and the resulting physical limitations. Tr. at 261. Dr. Hong noted that Plaintiff had fair eye contact, slowed motor skills, fluent speech, and she was in a depressed and anxious state.  *Id*. at 262.  She found Plaintiff's thought process organized with

no perceptual abnormalities or racing thoughts, and she was oriented with fair insight and judgment. *Id*. Dr. Hong increased Plaintiff's Seroquel and discussed stress management with her. *Id*.

On the same date, Dr. Hong completed a mental status questionnaire indicating that she first saw Plaintiff on January 27, 2010 and most recently treated her on April 28, 2010. Tr. at 276. She noted that Plaintiff's appearance as appropriate, and she reported that Plaintiff had spontaneous, relevant speech with no looseness of association, no pressured speech and no flight of ideas. *Id*. She reported Plaintiff's mood and affect as depressed, anxious, and irritable, with mood swings and somatic preoccupation. *Id*. She noted that Plaintiff had marked anxiety with panic episodes, paranoid feelings at times with no hallucinations, and she found Plaintiff oriented with some insight and fair judgment. *Id*. at 276-277. Dr. Hong opined that Plaintiff had poor concentration and attention, but an intact memory. *Id*. She diagnosed Plaintiff with major recurrent severe depression without psychotic features and rule out bipolar disorder not otherwise specified. *Id*. at 277. She noted Plaintiff's medications as Seroquel and Buspar and opined her prognosis as fair. *Id*. As to Plaintiff's abilities, Dr. Hong opined that Plaintiff was able to remember, understand and follow simple directions, she had poor ability to maintain attention, poor abilities to sustain concentration, persistence and pace, and her social interaction abilities were withdrawn, superficial and isolated, with poor adaptation, and a poor ability to respond to work pressures. *Id*.

On April 30, 2010, Dr. Hammerly, Ph.D. performed a psychological evaluation of Plaintiff for the agency. Tr. at 279. Plaintiff reported that she completed the tenth grade in high school and was in special education classes, then went to beauty school and dropped out of that. *Id*. She indicated that she had seven children and was married, but her husband was in prison. *Id*. Plaintiff related that she thought that she had a "physical defect" from a motor vehicle accident that "crushed a disc and fractured" her spine. *Id*. at 280-281. She also related that she was losing her mental capabilities. *Id*. at 281. Dr. Hammerly noted that Plaintiff's speech was clear and understandable and she had coherent, logical and goal-directed thought. *Id*. He found her mood downcast, with a constricted affect and Plaintiff expressed feelings of hopelessness and worthlessness, focusing on the current stressors of her child being in Iraq. *Id*. Dr. Hammerly noted no signs of shaking, fidgeting, rocking, trembling, or panic attacks, and no evidence of hallucinations or somatic

-7-

concerns. *Id*. He found that Plaintiff was alert and oriented, and her level of academic knowledge was estimated to be in the low borderline range. *Id*. at 283. He found that she had sufficient insight and judgment to live independently and to make decisions concerning her future. *Id.* He noted that Plaintiff reported that she does all of the household chores and does nothing else during the day except watch television and sleep. *Id*.

Dr. Hammerly diagnosed mood disorder not otherwise specified, which included symptoms of mood disturbance that were atypical, unclear, or that did not meet all of the criteria for an episode, "and clear signs of some sort of past disturbance, but a history that is marred by poor psychological insight, thus rendering etiology, duration, course, prognosis, and other diagnostic variables difficult to determine at present time." Tr. at 284. He found sufficient evidence to support the general diagnosis of mood disorder and he intimated a possible bipolar disorder II diagnosis based upon Plaintiff's report of an odd pattern of staying up for days at a time. *Id*. He assessed Plaintiff's GAF at 51-60, which indicated moderate symptoms, with a current GAF of 58. *Id.* He opined that Plaintiff had: no impairment in understanding, remembering and following simple routine tasks; in maintaining attention, concentration, persistence and pace to perform simple repetitive tasks; and moderate impairments in withstanding the stress and pressures of daily work activity, and in relating to others, including supervisors and co-workers. *Id*. at 285.

On May 20, 2010, Dr. Tangeman, Ph.D., an agency psychologist, conducted a review of Plaintiff's file and completed a psychiatric review technique form and mental RFC. Tr. at 289-305. He assessed Plaintiff's impairments from February 17, 2010 through May 20, 2010 under Listing 12.04 for affective disorder based upon Plaintiff's mood disorder not otherwise specified. *Id.* at 292. He found that Plaintiff's impairment mildly restricted her activities of daily living, caused moderate difficulties in maintaining social functioning, caused no restrictions in maintaining concentration, persistence or pace, and did not cause her to experience any episodes of decompensation. *Id.* at 299. As to Plaintiff's mental RFC, Dr. Tangeman concluded that Plaintiff had no limitations or was not significantly limited in: understanding, remembering and very short and simple or detailed instructions; remembering locations and work-like procedures; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular

-8-

attendance and being punctual; sustaining an ordinary routine without special supervision; making simple work-related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; maintaining socially appropriate behavior; being aware of normal hazards; traveling in unfamiliar places and taking public transportation; and in setting realistic goals or making plans independently of others. *Id.* at 303-304. He found that Plaintiff was moderately limited in: working in coordination with others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting. *Id.* In his functional capacity assessment, Dr. Tangeman reviewed the evidence and found that Plaintiff would be capable of performing simple tasks in a job that does not require more than brief superficial interactions with others and no high production standards. *Id.*

Plaintiff continued to treat with Zepf Center nurses and Dr. Hong for her mental health conditions and medication management from May 2010 through July 2012. Tr. at 314-322, 460-468. Treatment notes show that Plaintiff was described as alert and oriented, with good eye contact, no motor abnormality, a depressed, anxious and irritable mood, full affect, clear speech, goal-directed thoughts, poor sleep, and no suicidal ideations. *Id.* On June 23, 2010, Plaintiff reported that the increased dosage of Seroquel was beneficial as she was dealing better with stressors and she was sleeping better at night. *Id.* at 316. She requested that the dosage be increased but the dosage was kept the same. *Id.* She reported no side effects. *Id.*

Dr. Hong completed a medical source statement of Plaintiff's mental ability to do work-related activities on October 26, 2010. Tr. at 342. She opined that Plaintiff had no impairments in understanding, remembering and executing simple instructions, but she had moderate impairment in making judgments on simple, work-related decisions and marked impairments in understanding, remembering and executing complex instructions and in making judgments on complex work-related decisions. *Id.* She identified Plaintiff's feelings of depression, anxiety and irritable mood as factors

supporting her assessment. *Id*. Dr. Hong further opined that Plaintiff had mild impairment in interacting appropriately with the public, but she had marked impairment in her ability to interact appropriately with supervisors and co-workers and in responding appropriately to usual work situations and to changes in routine work settings. *Id*. at 343. Dr. Hong cited Plaintiff's paranoid and guarded demeanor around people, as well as her isolated and racing thoughts, poor attention and concentration, and her poor frustration tolerance. *Id*. She further noted Plaintiff's occasional problems dealing with daily living activities and Plaintiff's back pain. *Id*.

On May 11, 2011, Plaintiff met with Dr. Hong and related that she had been tolerating her medications and the Remeron she had prescribed seemed to be helping. Tr. at 493. She reported that she still had anxiety and sleeping problems and she was having panic episodes while riding in the car at times. *Id*.

On July 6, 2011, Plaintiff reported to Dr. Hong that she had visited one of her sons in Colorado for four days and had left her medications there, so she was not feeling well. Tr. at 489.

On July 11, 2011, Dr. Hong completed a medical source statement indicating that Plaintiff's mental impairments affected her abilities to perform work-related activities in that she was moderately limited in understanding and remembering complex instructions, and in interacting appropriately with supervisors and co-workers. *Id*. at 512-513. Dr. Hong further opined that Plaintiff was markedly limited in carrying out complex instructions, making judgments on complex work-related decisions, and in responding appropriately to usual work situations and to changes in a routine work setting. *Id*. She further found that Plaintiff was mildly limited in making judgments on simple work-related decisions and Plaintiff was not impaired in understanding, remembering and executing simple instructions or in interacting appropriately with the public. *Id*. Dr. Hong identified the factors supporting her assessment as Plaintiff's depressed mood, anxiety, irritability, mood swings, poor concentration and attention level, poor frustration tolerance, and her short temper. *Id*.

On December 6, 2011, Dr. Hong prescribed Plaintiff Prozac in addition to Plaintiff's prescriptions of Seroquel, Remeron, Buspar and Trazadone. Tr. at 480.

On January 9, 2012, Plaintiff reported to the Zepf nurse that she liked Prozac better than Buspar as it made her feel calmer.  Tr. at 47.

On March 22, 2012, Plaintiff reported that her sleep and appetite were good and she experienced no side effects from her mental health medications.  Tr. at 470.

On April 18, 2012, Plaintiff reported having an anxiety attack while on a bus.  Tr. at 469.

On May 23, 2012, Plaintiff reported numerous family stressors at her session with Dr. Hong.  Tr. at 465.  However, she indicated that her medications were working well.  *Id.*

On June 20, 2012, a Zepf Center nursing assessment showed that Plaintiff denied side effects from her Prozac, Seroquel and Trazadone.  Tr. at 464.  She was alert and oriented, with good eye contact, no motor abnormality, clear speech, and goal-directed thought processes.  *Id.*  She reported good sleep and a good appetite.  *Id.*  She had an anxious mood, but she reported no stressors and medication compliance.  *Id.*

### B. HEARING TESTIMONY

At the hearing, Plaintiff testified that she was forty-two years old, married, and she had seven children.  Tr. at 33.  She related that her children's ages ranged from nine years old to twenty-seven years old and the only two minor children did not live with her but with their grandmother in Mississippi.  *Id.*  She lived alone as her husband was in prison.  *Id.*  She indicated that she did not have a driver's license and last had one in 2000.  *Id.* at 35.  She went to high school up through the tenth grade and indicated that she did not have a "formal" GED, although she thought she had passed a high school equivalency test.  *Id.* at 36.

Plaintiff testified that she last worked for social security purposes at a Shell Gas Station as a cashier.  Tr. at 37.  She was also a cook at a quick stop and had worked other fast food jobs but kept getting fired because she would make mistakes or could not get along with people.  *Id.* at 38.

When asked by the ALJ why she felt that she could not work, Plaintiff responded that her physical condition was deteriorating and her mental condition was deteriorating "a lot worse."  Tr. at 39.  She testified that her medications made her slur her speech so that people thought that she was high.  *Id.*  She also stated that she was claustrophobic and had anxiety.  *Id.*

-11-

Plaintiff indicated that she took Seroquel and it made her tired and slur her speech and she also took Prozac, Trazadone, Vicodin and Ibuprofen.  Tr. at 42.  She reported that the pain medications were not working, but she also stated that they dulled and numbed the pain and she had taken them before the hearing and she felt "okay."  *Id*. at 43.  She reported that her concentration was "zero" and she could not remember things and her short-term memory was getting worse.  *Id*.  She related that she had not had any inpatient hospitalizations and had not gone to the emergency room in the past year.  *Id*. at 44.  She indicated that she was going to see about getting back into physical therapy as they were stretching her neck and shoulders and it was "doing a little bit" for her.  *Id*. at 45.  She was also going to start counseling.  *Id*.

Plaintiff described the pain in her lower back and neck with a numbing in her left shoulder area.  Tr. at 48.  She stated that the neck pain was dull and the back pain was shooting and went down her leg sometimes.  *Id*.  She explained that she was in a car accident eight or nine years ago and she has had pain everyday since then.  *Id*.  She reported that the medication helped the pain and she had never had a MRI because her insurance would not cover one.  *Id*. at 49.  She opined that she could sit for half an hour and stand for ten minutes at the most before she has to move around.  *Id*. at 51.  She could bend a little bit, reach with her right hand, and could ascend steps but it would take awhile and she would need a railing.  *Id*. at 51-52.

As to her mental health conditions, Plaintiff related that she repeated herself a lot and could not remember things like before.  Tr. at 53.  She could focus if she really tried but could not multitask.  *Id*.  She felt anxious and nervous around people and rode a bus that picked her up in front of her house because it was much smaller than a public bus and rarely had other people on it besides her and the driver.  *Id*. at 55.  She described a typical day as waking up, drinking coffee, sitting on the porch, feeding her ferrets, washing dishes and watching her soap opera if she remembers to turn it on in time.  *Id*. at 56-57.  She eats once a day and will take a bath when she feels like it, which sometimes is once every five or six days because she has no energy or does not feel like taking one. *Id*. at 57.  She indicated that she sometimes stays with her friend at times and they watch the soap opera together.  *Id*. at 58.  She wakes up three to four times per night and keeps her home spotless as she does not like clutter.  *Id.* at 58-59.  However, she will sit down between chores and takes

-12-

breaks.  *Id.*  In addition to her friend, Plaintiff spent time with her father and they go out to eat every Monday.  *Id.* at 60.

Plaintiff indicated that she woke up at night because of pain or because she has to use the bathroom and she then cannot fall back asleep, which made her tired in the morning.  Tr. at 63.  She does not sleep during the day, however, and does not lay down unless she has to because she is overweight and it is uncomfortable to lie down and it hurts her back.  *Id.* at 64.

The VE then testified.  Tr. at 67.  The ALJ presented a hypothetical person with Plaintiff's age, education and work experience with limitations to medium work and additional limitations of: simple, routine, repetitive tasks, occasional and superficial interactions with others; no production-paced work; only occasional changes to the work setting; occasional use of judgment; and occasional decision-making.  *Id.* at 68-69.   The VE concluded that such a hypothetical person could not perform any of Plaintiff's past relevant work, but other jobs existed in significant numbers in the economy for such a person, including the representative occupations of a dishwasher, cafeteria attendant, and a laundry worker.  *Id.* The ALJ added a limitation of only occasional exposure to environmental irritants, extreme temperatures, wetness and humidity, and the VE testified that such a hypothetical individual would not be able to perform the dishwasher job.  *Id.*

The ALJ thereafter modified the hypothetical individual by removing the medium work level and substituting a light work level.  Tr. at 70.  The VE testified that this modification would not change the representative occupations that he had identified from the prior hypothetical person.  *Id.* The ALJ then modified the light work level and made it a sedentary work level, to which the VE responded that no jobs existed for an individual with such limitations and a sedentary work level restriction.  *Id.*  The ALJ then inquired about the customary expectations of employers with regard to employees taking breaks and being absent, with the VE responding that customary breaks are one to two per shift for thirty to sixty minutes and absenteeism of no more than one day per month.  *Id.* at 70-71.  He further related that employers tolerates off-task performance of less than ten percent.  *Id.* at 71.  The VE testified that work would be precluded for someone whose breaks, absences and off-task performance exceeded the numbers that he provided as customary.  *Id.*

Plaintiff's counsel had no questions for the VE.  Tr. at 71.

-13-

### III.    SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffered from bipolar disease, anxiety, substance abuse in remission, asthma, DDD and spondylosis, which qualified as severe impairments under 20 C.F.R. §416.920(c). Tr. at 13. The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 416.920(d), 416.925, and 41604.926 ("Listings"). *Id*.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined by 20 C.F.R. § 416.967(b) with the limitations of: simple, routine, repetitive tasks; only occasional interactions with others; occasional changes to her work setting; no production-paced work; occasional use of judgment; occasional decision-making; and only occasional exposure to environmental irritants, extreme temperatures, wetness and humidity. Tr. at 15. The ALJ ultimately concluded, in reliance upon the testimony of the VE, that although Plaintiff was unable to perform her past work as a fast food cook, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of housekeeping/cleaner, sales attendant and mail clerk. *Id*. at 22-23. Consequently, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.     If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.     If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon

-15-

the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI.    LAW AND ANALYSIS

### A.    TREATING PHYSICIAN RULE AND HARMLESS ERROR

Plaintiff asserts that the ALJ erred in not attributing substantial weight to the opinions of her treating psychiatrist, Dr. Hong.  ECF Dkt. #17 at 15-16.  The Court finds that the ALJ violated the treating physician rule, but said violations are harmless.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007).  If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, she must consider the following in determining the weight to give to that opinion:  the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and other relevant factors.  *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, she must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell*

-16-

*v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Id.*  If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  *Id.,* citing  20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion.  *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors."  710 F.3d at 376. The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion."  *Id.* at 377.

In the instant case, Dr. Hong completed four mental functional capacity assessments, three in 2010 and one in 2012.  Tr. at 239, 276-278, 342-344, 512-514.  In the first assessment, dated March 10, 2010, Dr. Hong found Plaintiff not significantly limited in understanding, remembering and executing simple instructions, but found her markedly limited in performing activities within a schedule, maintaining regular attendance, being punctual, completing a normal workday or workweek without interruption from psychologically based symptoms and in performing at a consistent pace without an unreasonable amount and length of rest periods. *Id.* at 239.  Plaintiff does challenge the ALJ's granting of substantial weight to this opinion even though it was granted on the basis that it was consistent with the assessment of one-time examining psychologist Dr. Hammerly. ECF Dkt. #17 at 16; Tr. at 18.

Plaintiff does also challenge the ALJ's decision to attribute only "partial weight" to Dr. Hong's second assessment, dated April 28, 2010. ECF Dkt. #17 at 16; Tr. at 18. A little over one month after her first assessment, Dr. Hong completed this assessment, finding, among other things, that Plaintiff was able to remember, understand and follow simple directions, but she had poor abilities to maintain attention levels, sustain concentration, persistence and pace, to adapt to work situations, and to react to the daily pressures of work settings even with simple and routine, repetitive tasks. *Id*. at 277.

In deciding to attribute only partial weight to this opinion, the ALJ presented two reasons. Tr. at 18. She first stated that Dr. Hong's opinion was internally inconsistent because she found on the one hand that Plaintiff could remember, understand and follow simple directions, but she also found that Plaintiff had a poor ability to maintain and sustain concentration. *Id*.

The Court sees no inconsistency with the ALJ's finding that a claimant is able to understand, remember and execute simple and short instructions, yet has poor abilities to maintain attention and concentration for extended periods of time. This Court agrees with the Eighth Circuit's holding in *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) that:

> [a] marked limitation in the ability to maintain attention and concentration for extended periods is not inconsistent with an ability to remember locations or work-like procedures, or understand, remember, and carry out very short and simple instructions. Instructions that are by nature short and simple would not seem to pose a problem for someone who can maintain their attention and concentration for only short periods.

Thus, without further explanation by the ALJ as to why she found such an internal inconsistency in the instant case, the Court finds that this does not constitute a good reason for attributing less than controlling weight to Dr. Hong's April 28, 2010 opinion.

The ALJ's only other reason for attributing less than controlling weight to Dr. Hong's April 28, 2010 opinion relied upon Dr. Hong's GAF score for Plaintiff. Tr. at 18. The ALJ found that Dr. Hong's GAF score of 50 for Plaintiff "was before the claimant started treatment." *Id*. The Court notes that the Sixth Circuit has explained that "a GAF score is 'a subjective determination that represents the clinician's judgment of the individual's overall level of functioning.' A GAF score

is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues." *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684, 2011 WL 924688 (6th Cir.2011) (quoting, in part, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir.2009)).  Aside from the fact that a GAF score alone cannot be a sole dispositive factor, this statement of the ALJ in this case, without more, fails to provide any insight or explanation into the ALJ's reasoning for not affording controlling weight to Dr. Hong's opinion.

Accordingly, the Court finds that the ALJ violated the treating physician rule by failing to provide good reasons for affording less than controlling weight to Dr. Hong's April 28, 2010 opinion.

Plaintiff does not raise any assertion of error in his brief on the merits as to the ALJ's granting of only partial weight to Dr. Hong's third assessment, dated October 26, 2010.  ECF Dkt.#17 at 15-16.  However, Plaintiff mentions in her reply that Defendant's support of the ALJ's determination based upon Dr. Hong's inconsistency of the October 26, 2010 opinion with the April 28, 2010 opinion is without merit.  The Court agrees.

In addressing the partial weight that she gave to Dr. Hong's October 26, 2010 opinion, the ALJ explained that this opinion attributed more severe limitations after Plaintiff started treatment and it was inconsistent with Dr. Hong's April 28, 2010 opinion, which was only six months prior. Tr. at 18.  The Court finds no inconsistency between Dr. Hong's October 26, 2010 opinion and her April 28, 2010 opinion.  In the October 26, 2010 assessment, Dr. Hong opined that Plaintiff had no limitation in her abilities to understand, remember and execute simple instructions, she had mild limitations in interacting appropriately with the public, she had moderate limitations in making judgments or simple work-related decisions, and she had marked limitations in understanding, remembering and executing complex instructions, in making judgments on complex work-related decisions, in interacting appropriately with supervisors and co-workers, and in responding appropriately to usual work situations and to changes in a routine work setting.  *Id*. at 342-343.  She also found that Plaintiff had poor attention and concentration, and poor frustration tolerance.  *Id*. at 343.  In Dr. Hong's April 28, 2010 assessment, she found that Plaintiff was able to remember,

understand and follow simple directions, but she had poor ability to maintain attention, to sustain concentration and to persist, her social interactions were withdrawn, superficial and isolated, and she had poor adaptation to work situations and to react to the daily pressures of work settings even with simple and routine, repetitive tasks. *Id*. at 277.

In her brief on the merits, Defendant cites to numerous findings in the record that show that Dr. Hong's treatment notes were inconsistent with her latest assessment. ECF Dkt. #18 at 16. However, the ALJ did not cite to any treatment notes or this inconsistency to support her finding of such an inconsistency. Since Defendant's arguments in her brief on the merits were not included in the ALJ's reasoning, Defendant's assertions are improper post hoc rationalizations and cannot be relied upon before this Court. *See Reed v. Comm'r of Soc. Sec.*, No. 1:13-CV-02568, 2015 WL 506969, at *8 (N.D. Ohio Feb. 6, 2015), citing *Simpson v. Comm'r of Soc. Sec.*, 344 Fed.App. 181, 192 (6th Cir.2009)(citing *SEC v. Cherney Corp.*, 332 U.S. 194, 196 (1947)). Further, unlike the ALJ, this Court does not find that the latest assessment was more severe than the earlier assessments even though Plaintiff had started treatment. And even if the assessments were entirely different and the most recent was more severe, the ALJ fails to explain how or why this is an impossible finding or how this leads her to attribute less than controlling weight to the latest assessment. The Court therefore finds that the ALJ committed error in her treating physician rule analysis as to this assessment.

Finally, as to Dr. Hong's July 11, 2012 assessment, Plaintiff does not challenge the ALJ's treatment of this opinion.

In summary, the Court finds that the ALJ violated the treating physician rule in that she failed to present good reasons for attributing less than controlling weight to Dr. Hong's April 28, 2010 assessment and her October 26, 2010 assessment. Tr. at 18, 276-277, 342-344.

However, while the ALJ's treating physician rule analysis is lacking, a violation of the good reasons rule can be deemed "harmless error" if "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the

-20-

Commissioner has met the goal of § 1527(d)(2) ... even though he has not complied with the terms of the regulation." *Friend v. Comm'r of Soc. Sec*., 375 Fed.Appx. 543, 551 (6th Cir.2010) (quoting *Wilson*, 378 F.3d at 547).

Here, the Court finds that the ALJ's violation of the good reasons rule is harmless error. The Court first notes that the ALJ did adopt most of Dr. Hong's restrictions as she restricted Plaintiff to simple, repetitive and routine tasks with only occasional superficial interaction with others, occasional changes to work settings, occasional use of judgment and decision-making, and no production-paced work. Tr. at 15. These limitations coincide with Dr. Hong's opinions that Plaintiff was able to understand, remember and execute simple directions, she had difficulty maintaining attention, concentration and pace, she had difficulty with responding to changes in the work setting and in responding to others, in making work-related judgments and in work decision-making, and she had difficulty interacting with others and only engaged in superficial interaction. *Id*. at 239, 277, 343-344.

However, the ALJ did not adopt the severe degree of restriction opined by Dr. Hong. And while the ALJ's discussion of the reasons why she attributed less than controlling weight to Dr. Hong's opinions is lacking, a review of the rest of her decision leads the Court to conclude that she complied with the goal of 20 U.S.C. § 404.1527(d)(2). In applying the treating physician rule, the ALJ should compare the consistency of the physician's opinion to the record as a whole. 20 C.F.R. § 416.927(d)(2); *see Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978)(a disability determination should be made on the basis of the record as a whole.). When making such a comparison, "the ALJ may consider evidence such as the claimant's credibility, whether or not the findings are supported by objective medical evidence, as well as the opinions of every other physician of record. *See* SSR 96–5p, 1996 WL 374183, at *3 (S.S.A. July 2, 1996); SSR 96–8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996); *Hickey–Haynes v. Barnhart*, 116 Fed.Appx. 718, 726 (6th Cir.2004) (An ALJ may 'consider all of the medical and nonmedical evidence.' (quotation marks and citation omitted))." *Coldiron v. Comm'r of Soc. Sec*., No. 09-4071, 391 Fed. App'x 435, 442 (6th Cir. Aug. 12, 2010), unpublished.

-21-

Here, the ALJ reviewed the medical evidence in the other parts of her decision, including the opinions of Dr. Hammerly and the state agency reviewing physicians and psychologists, and she reviewed Plaintiff's testimony and statements.  Tr. at 17-19.  The ALJ noted that Plaintiff had informed Dr. Hong that she felt that her medications were beneficial and were lessening her symptoms.  *Id.* at 18, citing Tr. at 464-465, 469-470, 477, 485, 492-493, 495, 502.  The ALJ also cited to Dr. Hammerly's less restrictive limitations for Plaintiff based upon his interview and examination of Plaintiff, although the ALJ's mental RFC for Plaintiff included more restrictions than those opined by Dr. Hammerly.  *Id.* at 18, citing Tr. at 279.  The ALJ indicated that she gave great weight to Dr. Hammerly's opinion because he explained his findings and limitations for Plaintiff thoroughly.  *Id.* at 18.  Dr. Hammerly found that Plaintiff was moderately impaired in relating to others and in withstanding the stress and pressures of daily work activity, and she was not impaired in understanding, following and executing simple, routine tasks or in maintaining concentration, persistence and pace.  *Id.* at 279.  The ALJ also cited to Plaintiff's statements in her function report and to Dr. Hong that she got along well with others, she eats at restaurants, and she went to Colorado to visit her son.  *Id.* at 19, citing Tr. at 60, 489.  Such findings also undermine the consistency and supportability of Dr. Hong's opinion.  *Coldiron v. Comm'r of Soc. Sec.,* No. 09–4071, 391 Fed. Appx. 435, 440 (6th Cir. Aug 12, 2010), unpublished (finding that ALJ's failure to comply with treating physician rule harmless when ALJ's evaluation of other physician opinions and claimant's credibility undermined consistency and supportability of treating physician's opinion).

Based upon the above, the Court finds that the ALJ's decision as a whole indirectly attacked the supportability and consistency of Dr. Hong's opinions and met the goal of 20 C.F.R. § 404.1527(d)(2).  Thus, the ALJ's violation of the treating physician rule constitutes harmless error.

**B.**     **RFC**

Plaintiff also challenges the ALJ's physical and mental RFC determinations.  ECF Dkt. #17 at 10-15.  For the following reasons, the Court finds that substantial evidence supports the ALJ's determinations.

-22-

The Court notes that in her brief on the merits, Plaintiff merely cites to select portions of the medical evidence in the record concerning her physical and mental impairments and concludes that this evidence justifies a finding that she cannot perform sedentary or light work or competitive remunerative unskilled work.  ECF Dkt. #17 at 10-15.  However, the Court notes that the ALJ's decision must be affirmed when substantial evidence supports that decision, even if substantial evidence also would have supported the opposite conclusion.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citations omitted).  The Court finds that substantial evidence supports the ALJ's determination.

A claimant's RFC is the most that she can still do despite her functional limitations.  20 C.F.R. §416.945(a)(1); SSR 96-8p.  The assessment must be based upon all of the relevant evidence, including the medical records and medical source opinions.  20 C.F.R. §416.945(a).  And while an ALJ must consider opinions from medical sources on a claimant's RFC, the ALJ does not give any special significance to the source of opinions on this issue because it is an issue reserved for the ALJ and the final responsibility for deciding the RFC "is reserved to the Commissioner."  20 C.F.R. § 416.927(d)(2) and (3).

Plaintiff cites to Dr. Trivedi's March 25, 2010 evaluation of Plaintiff as evidence supporting her assertion that she cannot perform light or even sedentary work.  ECF Dkt. #17 at 10.  Plaintiff cites to Dr. Trivedi's diagnoses of chronic neck and back pain and highlights his conclusion that she was able to sit, stand and walk *with frequent rest periods*.  Tr. at 236-237.  Plaintiff also cites to medical records from April and June 2012 showing that she had tenderness over her spinal column, spasm, diminished sensation, and sluggish reflexes, somewhat limited lumbar flexion and her self-reported pain rating of 7 on a ten-point scale.  *Id*. at 10-11.

While Dr. Trivedi did conclude that Plaintiff was able to sit, stand and walk with frequent rest periods, she did not opine that Plaintiff was unable to perform light or sedentary work.  Nor did she define that which constitutes "frequent" breaks in her evaluation.  The record show that the ALJ properly considered this issue as she asked the VE at the hearing what was customarily expected by employers in terms of breaks and absences.  *Id*. at 70.  The VE responded that breaks of one to two

ten to fifteen-minute breaks per shift and a lunch break of thirty to sixty minutes was customary, as well as one day per month absence and less than ten percent of being off task.  *Id*. at 70-71.  The ALJ asked whether competitive work existed for a person who needed more breaks or absences or was off-task more than that to which the VE testified as customary.  *Id.* at 71.  The VE responded that no competitive employment existed for such an individual.

In determining her RFC, the ALJ cited to Dr. Trivedi's evaluation  and determined an even more restrictive RFC for Plaintiff than that of Dr. Trivedi.  Tr. at 18.  The ALJ explored the issue of "frequent" breaks at the hearing with the VE and decided that the customary breaks expected by employers was sufficient to accommodate Plaintiff.  Substantial evidence supports this finding and the ALJ's RFC.  The ALJ actually relied upon Dr. Trivedi's examination findings indicating that Plaintiff had no atrophy, a negative straight leg raising test and only slightly limited ranges of motion.  Tr. at 16, citing Tr. at 233-235.  And while Plaintiff also cites to medical records showing that she had tenderness over her spinal column, spasm, diminished sensation, and sluggish reflexes, and a self-reported pain rating of 7, the ALJ cited to back examinations in 2009 and December 2010 showing no back tenderness or issues with range of motion and a normal gait.  Tr. at 16, citing Tr. at 227, 347-348.  The ALJ further cited to Dr. Dasani's numerous findings visit after visit that Plaintiff's ability to work was 9 out of 10.  Tr. at 16, citing Tr. at 405, 410, 413, 416, 420, 423, 426.  The ALJ also noted that while Plaintiff did suffer back and neck pain stemming from a car accident in 2001, she had worked since that time.  *Id.* at 16.  She also noted that Plaintiff's only treatment modalities since 2001 were limited physical therapy and medication, which she reported were beneficial, and she was never referred for a MRI.  *Id.*  She further noted that Plaintiff reported falling off of a bicycle in 2011, which negated her testimony that activity aggravated her symptoms, and Plaintiff reported doing all of the household chores.  *Id*. at 16, 18.

Based upon the above, the Court finds that substantial evidence supports the ALJ's physical RFC for Plaintiff.

Plaintiff also challenges the ALJ's MRFC determination.  ECF Dkt. #17 at 11.  She relies upon Dr. Hong's assessments in asserting that she is unable to meet the basic mental demands of

unskilled work. *Id*. She cites to Social Security Ruling 85-15 which indicates that the basic mental demands of competitive, remunerative unskilled work include the abilities to understand, remember and execute simple instructions; to appropriately respond to supervisors, co-workers and usual work situations; and to deal with changes in a routine setting. *Id*. at 14.

The Court notes that the ALJ's mental RFC for Plaintiff limited her to simple, repetitive and routine tasks, with only occasional superficial interactions with others, only occasional changes to her work setting, occasional use of judgment and occasional decision-making. Tr. at 15. The ALJ further limited Plaintiff to no production-paced work. *Id*. In constructing this RFC, the ALJ properly noted that each of Dr. Hong's assessments indicated that Plaintiff could understand, remember and execute simple instructions and could make simple work-related decisions. *Id*. at 18, 239-240, 276- 277, 342-343, 512-514. Dr. Hammerly also opined that Plaintiff was not impaired in understanding, remembering and executing simple, routine tasks and instructions. *Id*. at 285. The ALJ also limited Plaintiff to only occasional superficial interactions with others, which corresponds to two of Dr. Hong's assessments, one which opined that Plaintiff was moderately restricted in interacting with others, and another indicating that Plaintiff was withdrawn and only engaged with others on a superficial basis. *Id*. at 17, 239, 277. This limitation is also supported by Dr. Hammerly's opinion that Plaintiff was moderately limited in this area, and Plaintiff's testimony that she watched a soap opera and sometimes stayed with a friend and she went to restaurants with her father. *Id*. at 18-19. As to changes in her work setting, her judgment and her decision-making, the ALJ's restriction of these abilities to an occasional basis corresponds to Dr. Hong's first assessment indicating that Plaintiff was moderately limited in responding appropriately to changes in a work setting, her second assessment noting that Plaintiff's judgment was fair and she had some insight, and Dr. Hong's third assessment indicating that Plaintiff was moderately restricted in making simple work-related judgments and decisions. *Id*. at 239, 276-277, 342, 344, 512. It is also supported by Dr. Hammerly's evaluation findings. *Id*. at 283-285. Finally, the ALJ's restriction of Plaintiff to no production-paced work corresponds to Dr. Hong's opinion that Plaintiff had poor ability to engage in sustained attention and to persist at tasks. *Id*. at 277. It also is much more restrictive than that opined by Dr. Hammerly, who found that Plaintiff had no impairment in maintaining attention,

-25-

concentration in each of her assessments, and that Plaintiff reported that her medications were beneficial.

To the extent that some parts of Dr. Hong's October 26, 2010 opinions were more restrictive than that of the ALJ, particularly Dr. Hong's marked restrictions as to Plaintiff's abilities to interact appropriately with supervisors and her co-workers, and respond appropriately to changes in a work setting, the ALJ indirectly explained her reasons for not adopting those parts of the assessments in the rest of her decision by discussing Dr. Hammerly's less restrictive social limitations for Plaintiff, Plaintiff's credibility which undermined such marked restrictions, including going to restaurants and socializing with a friend and family, and Dr. Hong's reports of unremarkable mental status examinations and Plaintiff's reports to Dr. Hong that her medications were beneficial. Tr. at 17-19. This constitutes substantial evidence to support the ALJ's decision to not only attribute less weight to the more restrictive parts of Dr. Hong's assessments, but also to support the ALJ's mental RFC for Plaintiff.

### C.   NEW AND MATERIAL EVIDENCE

Finally, Plaintiff requests that the Court remand the instant case on the basis of new evidence that she has submitted from Dr. Dasani which is dated from July 2012 through May 2013. ECF Dkt. #17 at 14. She also requests remand on the basis of new evidence from Zepf Center as well. *Id.* She concludes that these new materials establish that she is unable to perform the physical and mental demands of light or sedentary work. *Id.* at 14-15.

Sentence six of § 405(g) addresses situations where a claimant submits new evidence that was not presented to the ALJ but that could alter the ALJ's ultimate decision. Sentence six of § 405(g) provides, in relevant part:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both....

4 42 U.S.C. § 405(g).

A "sentence six" remand is appropriate "only if the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir.2010). Evidence is "new" if it did not exist at the time of the administrative proceeding and it is "material" if there is a reasonable probability that a different result would have been reached if introduced during the original proceeding. *Id.* "Good cause" is demonstrated by "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir.2001). "The party seeking a remand bears the burden of showing that these [ ] requirements are met." *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir.2006). Courts "are not free to dispense with these statutory requirements." *Id.* at 486.

In order to show good cause, a claimant is required to detail the obstacles that prevented her from entering the evidence in a timely manner. *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 Fed. Appx. 713, 725 (6th Cir.2012). The Sixth Circuit "takes a harder line on the good cause test' with respect to timing and thus requires that the claimant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.*, quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986).

In a sentence-six remand, the court does not rule in any way on the correctness of the administrative decision, neither affirming, modifying, nor reversing the Commissioner's decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.*

"'Good cause' is shown for a sentence-six remand only 'if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of

attempting to prove disability.'" *Payne v. Comm'r of Soc*. Sec., No. 1:09–cv–1159, 2011 WL 811422, at * 12 (W.D.Mich. Feb.11, 2010), unpublished (finding that evidence generated after the hearing and submitted to the Appeals Council for the purpose of attempting to prove disability was not "new").

Plaintiff points out that the "new and material" evidence that she submitted before the Appeals Council shows that from July 2012 through May of 2013, Dr. Dasani examined her for her neck, back and extremity pain and diagnosed her with lumbar degeneration and lumbar spondylosis. ECF Dkt. #17 at 14. She asserts that Dr. Dasani noted at her August 12, 2013 examination that her symptoms were exacerbated by activity, work and stress, she had a history of numbness and trauma, and she was unable to walk, drive, climb stairs or socialize. *Id*. Plaintiff also pointed to a June 12, 2013 treatment note from Zepf Center indicating that she was depressed with a constricted affect and disrupted sleep and she was taking Prozac, Seroquel and Trazadone. *Id*. Plaintiff cites to the basic mental demands of competitive unskilled work as set forth in SSR 85-15 and the definition of "sedentary" work and concludes that she is unable to perform the physical and mental requirements of light, sedentary and competitive sustained work. *Id*. at 15.

The Court notes that Plaintiff's "new and material evidence" submitted to the Appeals Council consists of treatment notes from Dr. Dasani dated July 17, 2012, August 17, 2012, September 14, 2012, October 18, 2012, November 12, 2012, and December 17, 2012 and records from Zepf Medical Center dated May 14, 2013 through June 12, 2013. Tr. at 2, 516-537.

Defendant contends that the July 17, 2012 notes from Dr. Dasani are not "new" in that they existed prior to the ALJ's decision and thus Plaintiff could have obtained the notes before the ALJ issued his decision. ECF Dkt. #18 at 18. The Court agrees as this treatment noted predated the ALJ's decision by nearly a month and Plaintiff fails to explain why she could not have presented this note to the ALJ prior to her decision.

Defendant asserts that the rest of the treatment notes of Dr. Dasani are not "material" because they do not relate to the time period at issue in the ALJ's decision, that is, from the alleged onset date of disability of March 1, 2008 through the August 10, 2012 date of the ALJ's decision. ECF Dkt.

#18 at 18-20.  Defendant also contends that these records are not "material" because they do not show a reasonable probability that the ALJ would have reached a different decision if presented with these records.  *Id.* at 18.  Finally, Defendant argues that the treatment notes are mostly cumulative to records already in the record and any additional objective findings in them fail to show any marked departure from previous examinations already in the record.  *Id.* at 19.

The Court agrees that the rest of Dr. Dasani's treatment notes and the Zepf Medical Center notes that Plaintiff seeks to submit do not relate to the relevant time period at issue in this case.  Besides the July 17, 2012 note, the rest of the notes were created after the ALJ's decision and were drafted for examinations that occurred after the ALJ's decision.  Tr. at 516-535.  Plaintiff does not assert that these records are material because they show a deterioration of her conditions or symptoms.  ECF Dkt. #17 at 14-15.  However, even if she did, this argument fails.  Evidence of a deterioration of a condition is not relevant since it "does not demonstrate the point in time that the disability itself began."  *Sizemore v. Sec'y of Health and Human. Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).  Here, the after-acquired evidence fails to show that the date upon which her impairments actually became disabling had occurred during the relevant time period at issue in this case.  Tr. at 517-535.

In addition, Plaintiff has failed to show that, based upon the remaining records, the Commissioner would have reached a different decision if presented with this additional evidence.  *See Foster v. Halter*, 279 F.3d 348, 358 (6th Cir. 2001).  The after-acquired treatment notes from Dr. Dasani and Zepf Center fail to establish more than that already considered by the ALJ from the timely treatment notes.  Accordingly, the Court finds that the evidence that Plaintiff seeks to submit as "new and material" are not material and would not change the result in these proceedings.

## VII.  CONCLUSION

For the foregoing reasons, the Court AFFIRMS the ALJ's decision and dismisses Plaintiff's case with prejudice.

DATE: March 11, 2015

_/s/George J. Limbert_____
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE